Slip Op. 18-136

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ZHEJIANG QUZHOU LIANZHOU REFRIGERANTS CO., LTD. AND ZHEJIANG QUHUA FLUOR-CHEMISTRY CO., LTD.,<br><br>            Plaintiffs,<br><br>       v.<br><br>UNITED STATES,<br><br>                 Defendant,<br><br>       and<br><br>ARKEMA INC., THE CHEMOURS COMPANY FC LLC, HONEYWELL INTERNATIONAL INC., AND MEXICHEM FLUOR INC.,<br><br>             Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br>Court No. 17-00121<br><br>**PUBLIC VERSION** |

## <u>OPINION</u>

[Plaintiffs' motion for judgment on the agency record is denied. Commerce's Final Determination is supported by substantial evidence and otherwise in accordance with law; therefore, the Final Determination is sustained and judgment will enter for Defendant.]

                                   Dated: October 11, 2018

<u>Jordan C. Kahn</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, argued for Plaintiffs. With him on the brief were <u>Ned H. Marshak</u> and <u>Max F. Schutzman</u>.

<u>Kelly A. Krystyniak</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant Director. Of counsel on the brief was

David Richardson, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Jonathan Zielinski, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for Defendant-Intervenors. With him on the brief were James R. Cannon, Jr. and Ulrika K. Swanson.

Barnett, Judge:  Plaintiffs Zhejiang Quzhou Lianzhou Refrigerants Co., Ltd. ("Lianzhou"), and Zhejiang Quhua Fluor-Chemistry Co., Ltd. ("Quhua") (together, "Plaintiffs"), challenge the United States Department of Commerce's ("Commerce" or the "agency") final determination in the antidumping duty investigation of 1,1,1,2 Tetrafluoroethane (R-134a) from the People's Republic of China ("PRC" or "China"). *See 1,1,1,2 Tetrafluoroethane (R-134a) from the People's Republic of China*, 82 Fed. Reg. 12,192 (Dep't Commerce March 1, 2017) (final determination of sales at less than fair value and aff. determination of critical circumstances, in part) ("*Final Determination*"), ECF No. 19-4, and accompanying Issues and Decision Memorandum ("I&D Mem."), A-570-044 (Feb. 21, 2017), ECF No. 19-5.[1]  Specifically, Plaintiffs challenge Commerce's denials of Lianzhou's and Quhua's requests for separate rates and assignment thereto of the China-wide antidumping duty rate.   *See* Confidential Pls.' Mot. for J. on the Agency R. and Mem. of Law in Supp. of Pls.' Mot. for J. on the Agency R. ("Pls.' Mem."), ECF No. 26.  Defendant United States ("Defendant") and

---

[1] The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 19-1, and a Confidential Administrative Record ("CR"), ECF No. 19-2.  Parties submitted joint appendices containing record documents cited in their briefs.  *See* Public JA ("PJA"), ECF No. 42; Confidential JA ("CJA"), ECF Nos. 40-41.  The court references the confidential versions of the relevant record documents, if applicable, throughout this opinion, unless otherwise specified.

Defendant-Intervenors[2] support Commerce's determination.  *See* Def.'s Resp. to Pls.'

Mots. [sic] for J. on the Agency R. ("Def.'s Resp."), ECF No. 32; Confidential Resp. Br.

of Arkema Inc., The Chemours Co. FC, LLC, Honeywell International Inc., and

Mexichem Fluor, Inc. ("Def.-Ints.' Resp."), ECF No. 33.  For the following reasons,

Plaintiffs' motion is denied.

## BACKGROUND

On March 23, 2016, Commerce initiated an investigation into 1,1,1,2

Tetrafluoroethane (R-134a) from China alleged to have been sold in the United States

at less than fair value.  *See 1,1,1,2 Tetrafluoroethane (R-134a) from the People's*

*Republic of China*, 81 Fed. Reg. 18,830, 18,830 (Dep't Commerce April 1, 2016)

(initiation of less than fair value investigation), PR 27, CJA Tab 3, PJA Tab 3, ECF No.

40.[3]  In the notice of initiation, Commerce directed exporters and producers seeking a

separate rate to submit a separate rate application and respond to Commerce's quantity

and value questionnaire.  *Id.* at 18,834.  Commerce further instructed that companies

selected as mandatory respondents must respond to all parts of the agency's

antidumping questionnaire to be eligible for a separate rate.  *Id.*

Quhua timely submitted its separate rate application.  *See* Quhua Separate Rate

Appl. (May 9, 2016) ("Quhua SRA"), CR 50-54, PR 70-71, CJA Tab 4, PJA Tab 4, ECF

No. 40.  Commerce selected Lianzhou as a mandatory respondent; thus, Lianzhou

---

[2] Defendant-Intervenors include Arkema Inc., The Chemours Co. FC, LLC, Honeywell
International Inc., and Mexichem Fluor, Inc. (collectively, "Defendant-Intervenors").
[3] The period of investigation is July 1, 2015 to December 31, 2015. *Final
Determination*, 82 Fed. Reg. at 12,192.

submitted its request for a separate rate in Section A of its questionnaire response.  *See*

Respondent Selection Mem. (Apr. 26, 2016) at 1, CR 34, PR 60, CJA Tab 10, PJA Tab

10, ECF No. 40; Lianzhou Sec. A Questionnaire Resp. (May 31, 2016) ("Lianzhou

AQR") at 2-22, CR 66-83, PR 87-92, CJA Tab 5A, PJA Tab 5, ECF No. 40.

In September 2016, Commerce preliminarily denied Lianzhou's and Quhua's

separate rate requests.  *See* Decision Mem. for Prelim. Determination (Sept. 29, 2016)

("Prelim. Mem.") at 17, PR 172, CJA Tab 6, PJA Tab 6, ECF No. 41; Prelim. Denial of

Separate Rates (Sept. 29, 2016) ("Separate Rate Mem."), CR 151, PR 176, CJA Tab 7,

PJA Tab 7, ECF No. 41.[4]  Commerce determined that Plaintiffs' respective chains of

ownership each extended to the Chinese government because Lianzhou and Quhua

are wholly-owned by Zhejiang Juhua Co., Ltd. ("Zhejiang Juhua"),[5] which, in turn, is

majority owned (55.86 percent) by Juhua Group Corporation ("Juhua Group"), a state-

owned enterprise ("SOE") supervised by the State-owned Assets Supervision and

Administration Commission ("SASAC") of Zhejiang province.  *Id*. at 2 & n.9 (citing

Quhua SRA at 16, Exs. 7D, 12).[6]  Commerce also noted that Juhua Group may "elect

Zhejiang Juhua's directors . . . in accordance with the number of shares it owns, i.e.,

---

[4] Thereafter, Lianzhou did not participate as a mandatory respondent.  *See* Prelim.
Mem. at 3 (explaining that Commerce did not issue supplemental questionnaires to
Lianzhou on the basis of its preliminary finding of ineligibility for a separate rate).
[5] Zhejiang Juhua is a "publicly-traded company listed on the Shanghai Stock
Exchange."  Lianzhou AQR at 11 (emphasis omitted); *see also* Quhua SRA at 12.
[6] Exhibit 7D consists of various public announcements regarding actions taken at
Zhejiang Juhua's annual shareholder meetings.  *See* Quhua SRA, Ex. 7D.  Exhibit 12
consists of letters documenting Zhejiang Juhua's appointment of Quhua's executive
director, supervisor, general manager, and person in charge of finance.  *See* Quhua
SRA, Ex. 12.

55.86 percent." *Id*. at 2.[7]  Zhejiang Juhua, in turn, appoints Lianzhou's and Quhua's

executive director, supervisor, and general manager.  *Id*. at 2 & nn.7,10 (citing, *inter*

*alia*, Lianzhou AQR at 22;[8] Quhua SRA at 16, Exs. 7D, 12).  With respect to Lianzhou,

Commerce explained that "the general manager appoints other managers, including

deputy general managers."  Separate Rate Mem. at 2.  With respect to Quhua,

Commerce explained that Article 9 of Quhua's articles of association "establishes that

all operations, profit distribution, *etc*. are subject to review by Zhejiang Juhua, whose

management is subject to government control."  Separate Rate Mem. at 2 & n.11 (citing

Quhua SRA at 16, Exs. 7D, 12).[9]

On March 1, 2017, Commerce affirmed its preliminary finding in the *Final*

*Determination*.  82 Fed. Reg. at 12,194 n.16.  Commerce confirmed that Plaintiffs are

each "indirectly majority-owned by an SOE," i.e, Juhua Group, and explained that it

"would expect any majority shareholder, including a government, to have the ability to

control, and an interest in controlling, the operations of the company, including the

---

[7] Certain information treated as business proprietary in the Separate Rate Memorandum and other record documents is disclosed herein on the basis of Plaintiffs' representation to the court that the information is now public.

[8] Commerce also cited to "Ex. A-9 at Art. 9" of Lianzhou's Section A Questionnaire Response.  Separate Rate Mem. at 2 n.7.  Exhibit A-9 consists of letters documenting Zhejiang Juhua's appointment of Lianzhou's executive director, supervisor, and general manager; thus, there is no Article 9 therein.  *See* Lianzhou AQR, Ex. A-9.  Article 9 of Lianzhou's articles of association, however, provides for Zhejiang Juhua's appointment of Lianzhou's executive director, supervisor, and general manager.  *See* Lianzhou AQR, Ex. A-7 at Art. 9.

[9] Quhua's articles of association are appended to its separate rate application at Exhibit 10.  Article 9 governs Zhejiang Juhua's responsibilities as sole shareholder.  *See* Quhua SRA, Ex. 10 at Art. 9.

selection of management and the [company's] profitability."  I&D Mem. at 12 & n.65

(citing Lianzhou AQR at 11; Quhua SRA at 12).  According to Commerce, "the majority

ownership holding in and of itself means that the government exercises, or has the

potential to exercise, control over the company's operations generally."  *Id*. at 11.

Commerce pointed to the "various responsibilities" assigned to Juhua Group in Zhejiang

Juhua's articles of association, *id*. at 13 & n. 68 (citing Quhua SRA, Ex. 7C ("Zhejiang

Juhua Arts. of Assoc.")), and Zhejiang Juhua's active participation in Plaintiffs' daily

operations, *id*. at 12-13 & n.67 (citing Lianzhou AQR at 25).

Commerce disagreed with Plaintiffs' argument that Chinese law insulates them

from government control, finding instead that the various legal provisions relied upon by

Plaintiffs enable the government to "control the business activities of a company when

the government is a controlling shareholder."  *Id*. at 13 & n.73 (citation omitted).

Commerce further disagreed with Plaintiffs' argument that their respective

articles of association place control over their day-to-day operations with their

respective managers.  *Id*. at 14-15.  Upon review of those documents, Commerce

determined that "Quhua's and Lianzhou's management is beholden to Zhejiang Juhua,

the sole owner of each company, whose board is controlled by Juhua Group, which is

wholly state-owned."  *Id*. at 14 & n.81 (citing Lianzhou AQR, Ex. A-7; Quhua SRA, Ex.

10).  According to Commerce, "[t]he fact that Quhua's and Lianzhou's shareholder

appoints and changes the executive directors, general managers, and supervisors does

not prove the absence of government control when the only shareholder, who is

majority owned by SASAC, controls all shareholder decisions."  *Id*. at 15.

Commerce also rejected Plaintiffs' argument that the agency had impermissibly relied on the mere potential for government control by failing to cite to a specific instance of Juhua Group exercising its legal right to control or influence Plaintiffs' exports of subject merchandise.  *Id*.  Commerce noted that Plaintiffs bear the burden of rebutting the presumption of government control, and evidence demonstrated that "Juhua Group, has the right to '[perform] supervision on, making suggestion for or inquiry on the operation of Zhejiang Juhua, the sole shareholder of Quhua and Lianzhou.'"  *Id*. at 15 & n.89 (citing Zhejiang Juhua Arts. of Assoc., Art. 32(III)).

On May 18, 2017 Plaintiffs initiated this action challenging Commerce's *Final Determination*.  Summons, ECF No. 1; Compl., ECF No. 8.  Plaintiffs' joint Rule 56.2 motion is fully briefed, and on September 11, 2018, the court heard oral argument.  ECF No. 47.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i)(2012),[10] and 28 U.S.C. § 1581(c) (2012). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d

---

[10] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition, unless otherwise stated.

1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB.*, 305 U.S. 197, 229

(1938)).

DISCUSSION

**I.      Legal Framework Governing Separate Rate Status in Proceedings
Involving Nonmarket Economy Countries**

In antidumping duty proceedings involving a country, such as China, that

Commerce considers to have a nonmarket economy, Commerce employs a rebuttable

presumption that all enterprises operating within that country are controlled by the

government.  *See Huaiyin Foreign Trade Corp.,* 322 F.3d at 1372; *Sigma Corp. v.

United States,* 117 F.3d 1401, 1405 (Fed. Cir. 1997) (reviewing and affirming

Commerce's use of the presumption); *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v.

United States* ("*Jiasheng I*")*,* 38 CIT ___, ___, 28 F. Supp. 3d 1317, 1338 (2014).

Commerce assigns each exporter of subject merchandise a single countrywide rate,

unless the exporter requests an "individualized antidumping duty margin" and

"demonstrate[s] an absence of state control" over its export-related activities, *Huaiyin

Foreign Trade Corp.,* 322 F.3d at 1372, both in law (*de jure*) and in fact (*de facto*),

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States* ("*Jiasheng II*"), 39 CIT

___, ___, 121 F. Supp. 3d 1263, 1266 (2015); *see also Sigma Corp.*, 117 F.3d at 1405

("no manufacturer would receive a separate antidumping duty rate unless it could

demonstrate that it enjoyed both *de jure* and *de facto* independence from the central

government").  The exporter of subject merchandise bears the burden of showing it is

autonomous of government control.  *AMS Assoc., Inc. v. United States*, 719 F.3d 1376,

1379-80 (Fed. Cir. 2013); *see also Sigma Corp.*, 117 F.3d at 1405-06 (Commerce's decision to place the burden on exporters is justified because exporters have best access to information) (citing *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)).

To establish whether an exporter is eligible for a separate rate, Commerce applies a test it first set forth in *Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588, 20,589 (Dep't Commerce May 6, 1991) (final determination of sales at less than fair value), and modified in *Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22,585, 22,586-87 (Dep't Commerce May 2, 1994) (final determination of sales at less than fair value); *see also* Policy Bulletin on the Topic of Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (April 5, 2005) ("Policy Bulletin 05.1") at 1-2, *available at* http://enforcement.trade.gov/policy/bull05-1.pdf (last visited Oct. 4, 2018) (restating the *de jure* and *de facto* criteria).  Only Commerce's finding pursuant to the *de facto* test is challenged here.[11]

To determine whether an exporter is free of *de facto* government control, Commerce considers four factors: (i) whether export prices are set by or subject to the approval of a governmental authority; (ii) whether the exporter has authority to negotiate and sign contracts and other agreements; (iii) whether the exporter has autonomy from the government in making decisions regarding the selection of its management; and (iv)

---

[11] Commerce made no findings regarding *de jure* control.  *See* I&D Mem. at 10-16.

whether the exporter retains the proceeds of its export sales and makes independent

decisions regarding the disposition of profits or financing of losses.  Policy Bulletin 05.1

at 2; *see also Jiasheng I*, 28 F. Supp. 3d at 1349.

Here, Commerce's denial of a separate rate turned on Plaintiffs' failure to

establish that it met the third criterion regarding management selection.  I&D Mem. at

12-15.  Plaintiffs challenge Commerce's determination as lacking substantial evidence

and unlawful.  *See generally* Pls.' Mem.

## II.     Whether Commerce's Determination is Supported by Substantial Evidence

### A.  Parties' Contentions

Plaintiffs contend that Commerce erroneously treated them as part of the PRC-

wide entity on the basis of mere potential for government control over management

selection through indirect majority ownership.  Pls.' Mem. at 31-35; Confidential Pls.'

Reply Br. ("Pls.' Reply") at 2-5, ECF No. 38.  Plaintiffs further contend that extensive

record evidence demonstrates their autonomy from the government with regard to

management selection.  Pls.' Mem. at 28-31.  Specifically, Plaintiffs contend that

Zhejiang Juhua's articles of association and Chinese law together protect Zhejiang

Juhua from its controlling shareholder and ensure that "[t]he democratically elected

Zhejiang Juhua board selects its own management, as well as that for Plaintiffs."  *Id*. at

31 (asserting that "the public ownership of Zhejiang Juhua extinguishes any ability for

Juhua Group or SASAC to control the selection of Plaintiffs' management.").  Plaintiffs

also contend that Commerce impermissibly denied their separate rate requests on the

basis of a single *de facto* criterion, *id*. at 24-28, and misapplied relevant judicial

precedent, *id*. at 35-41; *see also* Pls.' Reply at 14-17 (seeking to distinguish cases

affirming separate rate denials when a state-owned enterprise held indirect majority

ownership).[12]

Defendant and Defendant-Intervenors contend that Commerce's reliance on

indirect majority ownership to find that Plaintiffs failed to rebut the presumption of

government control is supported by substantial evidence.  Def.'s Resp. at 16-17, 19-25;

Def.-Ints.' Resp. at 7-11.  Defendant further asserts that Commerce properly relied on

Plaintiffs' failure to demonstrate autonomy with regard to management selection to deny

their separate rate requests, Def.'s Resp. at 18-19, and Commerce's determination is

consistent with relevant judicial precedent, *id*. at 26-31; *see also* Def.-Ints.' Resp. at 11-

14.

### B. Commerce's Determination that Plaintiffs Failed to Rebut the Presumption of Government Control is Supported by Substantial Evidence

Plaintiffs first challenge Commerce's determination as "based entirely on

speculation" and "the mere potential for control" by their indirect majority government

owner.  Pls.' Mem. at 32, 35.  Plaintiffs' argument fails to recognize Commerce's

reevaluation of the manner in which it interprets evidence of government ownership in

---

[12] Plaintiffs also contend that Defendant-Intervenors have advanced several arguments supporting Commerce's determination that Commerce itself did not rely upon.  Pls.' Reply at 7-8 (citing Def.-Ints.' Resp. at 4, 11-19).  It is well settled that the court may only sustain the agency's decision "on the same basis articulated in the order by the agency itself."  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).  Accordingly, the court limits its consideration to the grounds advanced by Commerce.

connection with the presumption of government control as a result of a series of court opinions issued in response to the *Diamond Sawblades* proceeding.  *See Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303 (Dep't Commerce May 22, 2006) (final determination of sales at less than fair value and final partial aff. determination of critical circumstances), as amended, 71 Fed. Reg. 35,864 (Dep't Commerce June 22, 2006); *Advanced Tech. & Materials Co., Ltd. v. United States* ("*AT&M I*"), Slip. Op. 11-122, 2011 WL 5191016, at *1 (CIT Oct. 12, 2011); *Advanced Tech. & Materials Co., Ltd. v. United States* ("*AT&M II*"), 36 CIT ___, 885 F. Supp. 2d 1343 (2012); *Advanced Tech. & Materials Co., Ltd. v. United States* ("*AT&M III*"), 37 CIT ___, 938 F. Supp. 2d 1342 (2013), *aff'd*, 581 F. App'x. 900, 901 (Fed. Cir. 2014);[13] I&D Mem. at 11 (noting Commerce's ongoing evaluation of its practice).

In litigation arising out of the *Diamond Sawblades* proceeding, the domestic industry challenged Commerce's grant of a separate rate to Advanced Technology & Materials Co. Ltd., Beijing Gang Yan Diamond Products Company, and Gang Yan Diamond Products, Inc. (collectively, "AT&M").  *See AT&M I*, 2011 WL 5191016, at *1. Commerce had initially granted AT&M a separate rate even though AT&M was majority-owned by the Central Iron and Steel Institute ("CISRI"), which, in turn, was wholly-owned and controlled by SASAC.  *Id.* at *5.  At the time, Commerce did not consider the "activities of [an exporter's] owner, or its owner's parent company," when conducting its

---

[13] The affirmance is nonprecedential.  *See* Fed. Cir. Rule 32.1(b).

separate rate analysis and, thus, had not addressed evidence showing that certain of

CISRI's board-members sat on AT&M's board and that AT&M's president and vice

chairman sat on CISRI's board. *Id.* at *10, *12.  The court remanded Commerce's

determination for further consideration of the implications of this indirect government

majority ownership.  *See id.* at *10, *12, *14.

On remand, Commerce initially affirmed its separate rate determination.  *See

AT&M II*, 885 F. Supp. 2d at 1348-49.  Commerce did not find the overlapping board

membership between AT&M and CISRI compelling on the basis that candidates

nominated by CISRI to sit on AT&M's board required unanimous consent to gain

appointment and, thus, CISRI did not "'control' AT&M's board," and further noted that

"CISRI's representatives on the board are a minority in number."  *Id.* at 1348-49.

The court again remanded Commerce's determination for failure "to consider

important aspects of the problem."  *Id.* at 1349.  The court noted that four of AT&M's

nine directors were CISRI representatives and the absence of evidence that the five

"non-CISRI" directors were free from government control.  *Id.* at 1358-59.  The court

further noted that two of the "non-CISRI" directors occupied AT&M management

positions and, thus, were "beholden to the board that controls their pay."  *Id*.  Because

"board members are properly presumed subject to governmental control, directly or

indirectly," the court concluded that "true independence and autonomy remain[ed] in

doubt until proven otherwise."  *Id.*  The court characterized Commerce's reliance on the

absence of record evidence demonstrating SASAC's exercise of its legal right to

intervene "in the selection of management and board members . . . as an evisceration of

the presumption of state control." *Id.* at 1358.  The court opined that the presumption

had not been rebutted to the point of shifting the burden to the domestic industry to

prove actual instances of government intervention.  *Id.*

    In the second remand redetermination, Commerce, under protest,[14] denied

AT&M's separate rate request on the basis that it had not demonstrated autonomy from

the government with regard to management selection.  *AT&M III*, 938 F. Supp. 2d at

1344.  Commerce explained that "government control had the potential to pass from

SASAC through to [AT&M] via CISRI," and this potential was exercised by CISRI's

nomination of five AT&M board members and its placement of four of its officials on

AT&M's board.  *Id.* at 1345.  The court sustained Commerce's determination.  *Id.* at

1353.

    Commerce's "protest" notwithstanding, in subsequent proceedings Commerce

has viewed evidence of majority government ownership as "mean[ing] that the

government exercises or has the potential to exercise control over the company's

operations generally, which may include control over, for example, the selection of

management . . . ."  Decision Mem. for the Prelim. Determination of the Antidumping

Duty Investigation of Carbon and Certain Alloy Steel Wire Rod from the PRC, A-570-

012 (Aug. 29, 2014) ("Steel Wire Rod Mem.") at 6-7, *available at* https://enforcement.

trade.gov/frn/summary/prc/2014-21335-1.pdf (last visited Oct. 4, 2018).  Accordingly,

---

[14] By issuing a redetermination under protest, Commerce signals its disagreement with
the court's opinion and preserves its right to appeal.  *See Meridian Prods. v. United
States*, 890 F.3d 1272, 1276 n.3 (Fed. Cir. 2018) (citing *Viraj Grp., Ltd. v. United States*,
343 F.3d 1371, 1376 (Fed. Cir. 2003)).

Commerce now "consider[s] the level of government ownership where necessary." *Id.*

at 7; *see also id.* at 8-9 (denying separate rates to certain exporters on the basis of

evidence of indirect majority government ownership); Issues and Decision Mem. for the

Final Aff. Determination in the Less-Than-Fair-Value Investigation of Hydrofluorocarbon

Blends and Components Thereof from the PRC, A-570-028 (June 21, 2016) at 50-53,

*available at* https://enforcement.trade.gov/frn/summary/prc/2016-15298-1.pdf (last

visited Oct. 4, 2018) (same); 1,1,1,2-Tetrafluoroethane from the PRC: Issues and

Decision Mem. for the Final Determination of Sales at Less Than Fair Value

Antidumping Duty Investigation, A-570-998 (Oct. 14, 2014) at 8-10, *available at*

https://enforcement.trade.gov/frn/summary/prc/2014-24903-1.pdf (last visited Oct. 4,

2018) (same).

The court recently addressed Commerce's use of the word "potential" as it now

relates to government control in cases involving majority and minority government

ownership.  *See An Giang Fisheries Imp. and Exp. Joint Stock Co. v. United States* ("*An*

*Giang II*"), 42 CIT ___, ___, 284 F. Supp. 3d 1350, 1361-64 (2018).[15]  In *An Giang II*,

the court explained that, in the context of majority government ownership, "potential

control . . . is, for all intents and purposes, actual control" because "the majority

shareholder can typically control the operations of a company without actually removing

directors or management since it is clear that directors or management *could be*

---

[15] *An Giang II* represents the court's opinion following the remand ordered in *An Giang
Fisheries Imp. and Exp. Joint Stock Co. v. United States* ("*An Giang I*"), 41 CIT ___,
___, 203 F. Supp. 3d 1256 (2017).

removed." *Id.* at 1359 (citing *AT&M III*, 938 F. Supp. 2d at 1348; *Jiasheng II*, 121 F.

Supp. 3d at 1266) (emphasis added).  In contrast, when, as in *An Giang II*, there is

minority government ownership, the phrase "potential control" may not suggest "actual

control."  *Id*.  Under those circumstances, "Commerce has required additional indicia of

control prior to concluding that a respondent company could not rebut the presumption

of *de facto* government control."  *Id.*; *see also id.* at 1361-1364 (affirming Commerce's

denial of a separate rate in light of evidence that an exporter's general director was

"beholden" to the minority government shareholder responsible for appointing him, as

well as evidence that company employees were "beholden" to the general director that

controlled their pay and had the ability to fire them).

     The foregoing discussion demonstrates that Commerce views government

ownership differently depending on whether the government is a majority or minority

owner.  Evidence of legal separation between an exporter subject to the nonmarket

economy presumption of government control and its parent company (and its parent's

state-owned parent company) of the type relied upon by Plaintiffs here *may* rebut the

presumption of *de facto* control over management selection when the government holds

a *minority* stake.  *Cf. Jiasheng II*, 121 F. Supp. 3d at 1268-73 (affirming Commerce's

grant of a separate rate on the basis that evidence of minority ownership alone was

insufficient to demonstrate *de facto* control); *An Giang II*, 284 F. Supp. 3d at 1361-64

(affirming Commerce's denial of a separate rate in light of evidence of minority

ownership plus instances of actual control).  In contrast, when, as here, the government

owns a *majority* stake, legal separation between the exporter and its direct and indirect

parent companies *does not* rebut the presumption because of the ever-present potential for the government to exert *de facto* control over the exporter's operations and management selection, and the expectation that it would do so.  *See* I&D Mem. at 11-12.  In the latter instance, absent contrary evidence,[16] Commerce reasonably infers that the government exerts *de facto* control by exercising its legal rights as a majority shareholder of the exporter's parent company, rendering each link in the chain of ownership ultimately beholden to the government.  *See id*. at 14; *Jiasheng I*, 28 F. Supp. 3d at 1339 ("In both its *de jure* and *de facto* determinations, Commerce may make reasonable inferences from the record evidence.") (citing *Daewoo Elecs. Co. v. United States,* 6 F.3d 1511, 1520 (Fed. Cir. 1993)); *cf. AT&M II*, 885 F. Supp. 2d at 1353 (explaining that Chinese corporate law protects the rights of investors; thus, when the government is the controlling investor/shareholder, the law "subject[s] the investee to governmental control") (emphasis omitted).[17]

Plaintiffs do not contest Commerce's factual findings regarding Lianzhou's and Quhua's respective chains of ownership.  Pls.' Mem. at 31-32 (citing I&D Mem. at 12).

---

[16] The court addresses Plaintiffs' assertion that Commerce has effectively rendered the presumption "irrebuttable" *infra*, pp. 27-28.

[17] Plaintiffs assert that, since 1994, Commerce has granted exporters a separate rate despite "significant—and even 100 percent—government ownership."  Pls.' Mem. at 18-19 (citations omitted).  In the only cited determination that post-dates the *AT&M* litigation, the government held a *minority* stake in the relevant entity.  *See* Issues and Decision Mem. for the Admin. Review of the Antidumping Duty Order on Small Diameter Graphite Electrodes from the PRC; 2014-2015, A-570-929 (Sept. 2, 2016) at 18-19, *available at* https://enforcement.trade.gov/frn/summary/prc/2016-21782-1.pdf (last visited Oct. 4, 2018).

Plaintiffs assert that record evidence nevertheless demonstrates autonomy with regard to management selection.  Pls.' Mem. at 28-31.  Plaintiffs' assertion is unavailing.

Plaintiffs first point to the lack of direct involvement of SASAC/Juhua Group in the selection or activities of Plaintiffs' respective boards, and the lack of SASAC's direct involvement in the selection or activities of Zhejiang Juhua's board.  Pls.' Mem. at 28 (citations omitted).  Plaintiffs' argument ignores that Juhua Group, an SOE, is the majority owner of Zhejiang Juhua, and that Zhejiang Juhua, subject to that majority ownership, is the sole owner of the Plaintiffs.  *See, e.g.*, I&D Mem. at 12 (discussing evidence of indirect majority ownership).

Plaintiffs also point to various aspects of Zhejiang Juhua's articles of association. Pls.' Mem. at 28-30.  Plaintiffs argue that Article 39 "ensur[es] that [] Juhua Group is a passive investor."  Pls.' Mem. at 28; *see also id.* at 29 ("Zhejiang Juhua is required by its [articles of association] to conduct its business operations as if it were 100 percent owned by the public, without any ownership interest of Juhua Group.)."  However, Article 39—which provides, *inter alia*, that "[a] controlling shareholder . . . shall not take advantage of its relationship to harm the interests of The Company," and owes "a fiduciary duty to The Company"—does not render Juhua Group a passive investor.  *See* Zhejiang Juhua Arts. of Assoc., Art. 39.  Article 39 simply requires that any actions Juhua Group takes as majority owner of Zhejiang Juhua are not harmful to Zhejiang Juhua's financial interest.  *See id.*

Plaintiffs next assert that Articles 40, 42, and 199 of Zhejiang Juhua's articles of association, along with Articles 37, 39, 99, and 100 of the Company Law of the People's

Republic of China ensure the democratic and transparent election of Zhejiang Juhua's board.  Pls.' Mem at 29; *see also* Lianzhou AQR, Ex. A-15 (Company Law of the People's Republic of China (effective March 1, 2014) ("PRC Company Law").  Article 39 of the PRC Company Law provides for the classification of shareholder meetings into regular and interim meetings.  PRC Company Law, Art. 39.  Article 99 cross-references and makes applicable Article 37, which provides for a company's shareholders to elect and replace its directors and supervisors, and to decide their pay.  *Id.*, Arts. 37, 99. Article 100 states that "[t]he general meeting of a company shall hold an annual meeting once every year."  *Id.*, Art. 100.  Articles 40 and 42 of Zhejiang Juhua's articles of association mirror those provisions.  *See* Zhejiang Juhua Arts. of Assoc., Art. 40 (discussing the shareholders' general meeting and associated functions, including appointment and remuneration powers), Art. 42 (discussing the classification of shareholder meetings).[18]  None of these provisions, however, constrain Juhua Group's ability to elect Zhejiang Juhua's directors in accordance with its majority shareholding. *See* Separate Rate Mem. at 2; Zhejiang Juhua Arts. of Assoc., Art. 32(II) (providing for voting in accordance with shareholdings).

Plaintiffs further assert that Articles 20 and 21 of the Code of Corporate Governance for Listed Companies and Articles 56 and 86[19] of Zhejiang Juhua's articles

---

[18] Article 199 of Zhejiang Juhua's articles of association sets forth rules governing dissolution in the event of Zhejiang Juhua's liquidation; thus, its relevance to Plaintiffs' argument is unclear.  *See* Zhejiang Juhua Arts. of Assoc., Art. 199.

[19] Plaintiffs' reference is to Article 82; however, their discussion suggests that this reference is a typographical error and they intended to refer to Article 86.  *See* Pls.' Mem. at 29.  Article 82 is discussed below.  *See infra*, note 21 and accompanying text.

of association protect Zhejiang Juhua from its controlling shareholder.  Pls.' Mem. at 29-

30; *see also* Lianzhou AQR, Ex. A-16 (Circular of the China Securities Regulatory

Commission and the State Economic and Trade Commission on the Issuance of the

Code of Corporate Governance for Listed Companies, Jan. 7, 2002) ("Corp. Code

Circular").  Pursuant to Article 20, "controlling shareholders shall nominate the

candidates for directors and supervisors in strict compliance with . . . laws, regulations

and the company's articles of association."  Corp. Code Circular, Art. 20.  Article 21

prohibits "controlling shareholders [from] . . . directly or indirectly interfer[ing] with the

company's [lawful] decisions or business activities."  *Id.*, Art. 21.  Articles 56 and 86 of

Zhejiang Juhua's articles of association require "candidates for directors and

supervisors" to disclose affiliations with controlling shareholders, and prevent

shareholders from voting on matters in which they retain an interest.  Zhejiang Juhua

Arts. of Assoc., Arts. 56, 86.  These rules and requirements, however, exist alongside,

and do not undermine, Juhua Group's "right to [perform] supervision on, making

suggestion for or inquiry on the operation of Zhejiang Juhua, the sole shareholder of

Quhua and Lianzhou."  I&D Mem. at 15 & n.89 (citing, *inter alia*, Zhejiang Juhua Arts. of

Assoc., Art. 32(III)) (internal quotation marks and additional citations omitted).[20]

---

[20]   Plaintiffs seek to rely on additional provisions of the Corp. Code Circular to demonstrate Zhejiang Juhua's independence from Juhua Group.  *See* Pls.' Mem. at 9-10 (citing Corp. Code Circular, Arts. 22-27).  While these provisions may demonstrate *de jure* autonomy, the issue here is *de facto* control, which the cited provisions fail to rebut.

Plaintiffs additionally point to Zhejiang Juhua's "cumulative voting"[21] system and online voting procedures that permit "smaller shareholders to have greater representation in voting." Pls.' Mem. at 30 (citing Zhejiang Juhua Arts. of Assoc., Art. 82). Even if that were true, Plaintiffs have not shown that these provisions constrain Juhua Group's exercise of its rights as majority shareholder.

Plaintiffs' reliance on Articles 125, 127, and 137 of Zhejiang Juhua's articles of association also lacks merit. *See id*. at 30. Article 127 provides that each board member holds one vote, while Article 125 provides that resolutions require more than half of all votes to pass. *See* Zhejiang Juhua Arts. of Assoc., Arts. 125, 127. Juhua Group's ability to elect the majority of the board, however, means that it effectively controls the majority of the votes. *See id*., Art. 32(II). Article 137 bars "[t]he person, who assumes the posts other than the director in a controlling shareholder or an actual controller," from "assum[ing] the post of senior management in [Zhejiang Juhua]." *Id*., Art. 137. This provision, however, appears to leave open the possibility that Juhua

---

[21] Cumulative voting

allows shareholders to cast all of their votes for a single nominee for the board of directors when the company has multiple openings on its board. In contrast, in "regular" or "statutory" voting, shareholders may not give more than one vote per share to any single nominee. For example, if the election is for four directors and you hold 500 shares (with one vote per share), under the regular method you could vote a maximum of 500 shares for each one candidate (giving you 2,000 votes total—500 votes per each of the four candidates). With cumulative voting, you are afforded the 2,000 votes from the start and could choose to vote all 2,000 votes for one candidate, 1,000 each to two candidates, or otherwise divide your votes whichever way you wanted.

Quhua SRA, Ex. 7D (definition of "Cumulative Voting"); *see also* Zhejiang Juhua Art. of Assoc., Art. 82 (governing cumulative voting procedures).

Group's "directors" or "controllers" may in fact assume positions within Zhejiang Juhua's

senior management, which positions include "general manager, deputy general

manager, person in charge of finance, and secretary of the Board of Directors."  *See id*.,

Art. 135.

In sum, Plaintiffs' insistence that Zhejiang Juhua's articles of association, the

PRC Company Law, and the Corp. Code Circular "extinguish[]" the government's *de*

*facto* control of Lianzhou and Quhua fails to persuade.  *See* Pls.' Mem. at 32.  Instead,

the cited provisions represent the legal vehicles through which Juhua Group exercises

its control over Zhejiang Juhua and, thus, Quhua and Lianzhou.  There is, therefore,

substantial evidence supporting Commerce's determination that Quhua's and

Lianzhou's management is "beholden" to Zhejiang Juhua, whose board is controlled by

the government-owned Juhua Group.  *See* I&D Mem. at 14; Separate Rate Mem. at 2.

Having determined that Plaintiffs failed to demonstrate autonomy vis-à-vis

management selection, Commerce was not required to conduct further analysis.[22]  "The

absence of *de facto* government control can be shown by evidence that the exporter

sets its prices independently of the government and of other exporters, negotiates its

_____

[22] Plaintiffs rely on *Jiasheng I* and *Jiasheng II* to support the proposition that Commerce failed to consider "the totality of the circumstances," including the *de jure* prong of the separate rate test and the three additional *de facto* criteria.  Pls.' Mem. at 24-25 (citing *Jiasheng I*, 28 F. Supp. 3d at 1339 n.160; *Jiasheng II*, 121 F. Supp. 3d at 1266); *id.* at 39.  In neither case, however, does the court state that Commerce must consider each criterion and prong and evaluate or weigh the exporter's relative fulfillment of each.  The *Jiasheng II* court also recognized that Commerce's post-*Diamond Sawblades* practice generally precludes an exporter or producer from obtaining a separate rate when it is majority-owned by the government, either directly or indirectly.  121 F. Supp. 3d at 1267.

own contracts, keeps the proceeds of its sales (taxation aside), *and* selects its

management autonomously."  *AMS Assoc.*, 719 F.3d at 1379 (citation omitted)

(emphasis added).  The test is conjunctive; thus, "Commerce requires that exporters

satisfy all four factors of the *de facto* control test in order to qualify for separate rate

status."  *Yantai CMC Bearing Co. Ltd. v. United States*, 203 F. Supp. 3d 1317, 1326

(2017) (citing *AT&M III*, 938 F. Supp. 2d at 1349).  Because Plaintiffs failed to satisfy

one *de facto* criterion, "Commerce had no further obligation to continue with the

analysis."  *Id.* at 1326; *see also Shandong Rongxin Imp. & Exp. Co., Ltd. v. United

States* ("*Rongxin III*"),[23] 42 CIT ___, Slip Op. 18-107 at 19 (Aug. 29, 2018).[24]

      Finally, Plaintiffs' argument that Commerce's determination is inconsistent with

relevant judicial precedent lacks merit.  Plaintiffs seek to distinguish the *Diamond

Sawblades* proceeding and *Yantai CMC* on the basis that those cases involved

instances of actual control and on the basis that those cases did not address the

protections afforded to publicly-traded companies by the Corp. Code Circular.  Pls.'

Mem. at 36-37 (citing *AT&M II*, 885 F. Supp. 2d at 1352, 1356); Pls.' Mem. at 39 (citing

*Yantai CMC*, 203 F. Supp. 3d at 1326).  Plaintiffs appear to misunderstand their burden.

Commerce presumes that exporters from a nonmarket economy country, such as

---

[23] The court decided *Rongxin III* following the court ordered remands in *Shandong
Rongxin Imp. & Exp. Co., Ltd. v. United States* ("*Rongxin II*"), 41 CIT ___, 203 F. Supp.
3d 1327 (2017), and *Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States*, 40 CIT
___, 163 F. Supp. 3d 1249 (2016).

[24] Accordingly, the court does not address Plaintiffs' arguments regarding evidence
demonstrating the absence of *de jure* control or the absence of *de facto* control vis-à-vis
the remaining criteria.  *See* Pls.' Mem. at 25-28.

China, are government-controlled unless the exporter demonstrates otherwise. *See,
e.g.*, *Huaiyin Foreign Trade Corp.,* 322 F.3d at 1372.  Plaintiffs' evidence, which

documented the unbroken chain of ownership from the Chinese government to

Lianzhou and Quhua and set forth the corporate and legal mechanisms pursuant to

which Juhua Group and Zhejiang Juhua discharge their ownership duties, failed to rebut

the presumption.  *Cf. AT&M II*, 885 F. Supp. 3d at 1358.[25]  The lack of evidence of

specific instances of actual control does not render Commerce's finding unsupported by

substantial evidence; indeed, in the context of majority government ownership, requiring

Commerce to point to such evidence turns the presumption on its head by placing the

burden on petitioners to prove the absence of autonomy.  *See AMS Assoc., Inc.*, 719

F.3d at 1379-80 (the respondent/exporter bears the burden of demonstrating autonomy

from government control); *cf. An Giang II*, 284 F. Supp. 3d at 1359 (noting that, in the

context of minority ownership, Commerce requires additional evidence of control before

concluding that an exporter has failed to rebut the presumption).  Plaintiffs' attempts to

analogize the facts of this case to those in which the court has remanded Commerce's

separate rate determinations are also unavailing.[26]

---

[25] Plaintiffs' assertion that "Juhua Group would violate the PRC Company Law if it were
to appoint Zhejiang Juhua's board members," Pls.' Mem. at 38 (emphasis omitted),
misses the point because Commerce made no such finding.  Rather, Commerce relied
upon Juhua Group's ability *as majority shareholder* to control "the operations of the
company, including the selection of management," and its interest in so doing.  I&D
Mem. at 12.

[26] Plaintiffs point to the *Jiasheng I* court's statement "that Commerce considers the
'totality of the circumstances' and does not rely solely on 'the *possibility* for
governmental control over export activities.'"  Pls.' Mem. at 39 (quoting *Jiasheng I*, 28 F.
Supp. 3d at 1339 n.160, 1348).  That case, however, involved minority government

In sum, Commerce's finding that Plaintiffs failed to rebut the presumption of

government control is supported by substantial evidence.

### III.   Whether Commerce's Determination is in Accordance with Law

### A. Parties' Contentions

Plaintiffs contend that Commerce misapplied the presumption of government

control.  Pls.' Mem. at 41-42.  According to Plaintiffs, the evidence they submitted

rebutted the presumption; thus, Commerce impermissibly denied their separate rate

applications absent evidence of specific instances of actual control.  *Id.* at 41-42; *see*

*also* Pls' Reply at 10-14.  Plaintiffs also assert that Commerce has "convert[ed] the

presumption into an irrebuttable finding of government control based on indirect

ownership" without "indicat[ing] what type of evidence would have been sufficient for

separate rates."  Pls.' Mem. at 42.  Plaintiffs further contend that Commerce departed

---

ownership.  Thus, evidence tracing ownership to the government did not merit the
denial of a separate rate.  *Jiasheng I*, 28 F. Supp. 3d at 1349.  Plaintiffs assert that *An*
*Giang I* "compels remand" on the basis of the court's finding that Commerce had
impermissibly relied on potential control to deny a separate rate request.  Pls.' Mem. at
40 (citing *An Giang I*, 203 F. Supp. 3d at 1291-92).  In *An Giang II*, however, the court
clarified the relevance of potential control in cases concerning majority and minority
government control and affirmed Commerce's determination. 284 F. Supp. 3d at 1359.
Plaintiffs also assert that *Rongxin II* "compels remand" on the basis of the court's
remand therein for Commerce to explain the propriety of its reliance on a respondent's
failure to fulfill one *de facto* criterion to deny a separate rate. Pls.' Mem. at 40-41 (citing
*Rongxin II,* 203 F. Supp. 3d at 1348).  Following remand, however, the *Rongxin III* court
affirmed Commerce's determination that the exporter had failed to establish the
absence of *de facto* control solely on the basis of its failure to demonstrate autonomy
regarding management selection.  *Rongxin III*, Slip Op. 18-107 at 19.

from the separate rate methodology stated in Policy Bulletin 05.1 without adequately

acknowledging or explaining its departure therefrom.  *Id*.

Defendant contends that Commerce applied properly the presumption of

government control and correctly found that Plaintiffs' evidence failed to address Juhua

Group's indirect control over Lianzhou and Quhua.  Def.'s Resp. at 31.  Defendant

further contends that Commerce adhered to its long-standing separate rate

methodology, and Plaintiffs' arguments "amount to mere disagreement" with the

agency's conclusion.  Def.'s Resp. at 31-32.[27]

### B.  Commerce Applied Properly the Presumption of Government Control

Plaintiffs assert that Commerce's analysis ran afoul of Federal Circuit precedent

regarding the operation of presumptions.  *See* Pls.' Mem. at 41-42 (citing *A.C.*

*Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992), *abrogated*

*on unrelated grounds by SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.,*

*LLC*, 137 S.Ct. 954, 959 (2017)).  Quoting *Aukerman*'s discussion of Federal Rule of

Evidence 301, which governs what is referred to as the "bursting bubble" theory of

presumptions,[28] Plaintiffs assert they met their burden of producing the "minimum

quantum of evidence" necessary to rebut the presumption.  Pls.' Mem. at 41-42 (quoting

---

[27] Defendant-Intervenors did not respond to Plaintiffs' arguments regarding the
lawfulness of Commerce's determination.  *See* Def.-Ints.' Resp. at 6-7 (presenting
arguments pertaining solely to the court's substantial evidence review).

[28] Pursuant to the bursting bubble theory, "a presumption is not merely rebuttable but
completely vanishes upon the introduction of evidence sufficient to support a finding of
the nonexistence of the presumed fact."  *Aukerman*, 960 F.2d at 1037-38 (discussing
the amount of evidence a patentee must proffer to rebut an alleged infringer's assertion
that the patentee waited too long to file an infringement action).

*Aukerman*, 960 F.2d at 1037).  The foregoing discussion demonstrates, however, that

Commerce properly found that Plaintiffs' evidence wholly failed to rebut the presumption

of government control.  *See supra* pp.18-25; I&D Mem. at 12-15.  Thus, to the extent

*Aukerman* informs the court's analysis, it is unhelpful to Plaintiffs' position.

Additionally, the court disagrees with Plaintiffs' assertion that Commerce has

"convert[ed] the presumption into an irrebuttable finding of government control based on

indirect ownership."  Pls.' Mem. at 42.  The presence of direct or indirect majority

government ownership may require exporters to surmount a high bar to demonstrate

the absence of *de facto* control, but it does not necessarily preclude exporters from

obtaining a separate rate.  *See* Def.'s Resp. at 22-23 (noting, for example, the absence

of evidence "that [] Juhua Group did not actually vote its shares");[29] *cf. Yantai CMC*, 203

F. Supp. 3d at 1325-26 ("That particular facts (majority ownership) may be sufficient

to support an agency determination of control, and the existence of those facts in this

particular case (*i.e.*, indirect majority control by SASAC), does not alter the test into an

irrebuttable presumption; instead, it means that, on the basis of these facts, Plaintiff

---

[29] Two opinions addressing Commerce's separate rate analysis have suggested otherwise.  *See An Giang II*, 284 F. Supp. 3d at 1362 ("A respondent may rebut th[e] presumption [of government control], unless record evidence demonstrates that the majority shareholder is controlled by the government."); *Jiasheng II*, 121 F. Supp. 3d at 1267 (Commerce's practice "holds that . . . majority ownership [] 'in and of itself' precludes a finding of *de facto* autonomy.") (citation omitted).  At oral argument, however, Defendant clarified that Commerce has not taken the position that majority government ownership *per se* bars separate rate eligibility.  Defendant posited the possibility that evidence in the form of an article of association limiting a government-owned entity from voting in accordance with its majority shareholding may compose affirmative evidence breaking the chain of control, but noted that such evidence was absent here.  Oral Arg. Recording at 30:10-32:33.

failed to rebut the presumption.").  That Commerce did not forecast the type of evidence that would be sufficient to rebut the presumption does not render its determination unreasonable or unsupported by substantial evidence.

### C.  Commerce Adhered to its Longstanding Separate Rate Analysis

Plaintiffs assert that Commerce deviated from Policy Bulletin 05.1 by (1) denying a separate rate on the basis of a single *de facto* criterion and thereby treating government ownership as dispositive; (2) relying on the potential for government control instead of actual control; and (3) acting contrary to a prior proceeding in which Commerce granted a separate rate notwithstanding evidence of government involvement in management selection.  Pls.' Mem. at 42-43 (citations omitted); *see also* Pls.' Reply at 17-21.  The court has largely dispensed with these arguments elsewhere. *See supra* pp. 23 & n.22 (Commerce properly may rely on a single criterion); *id.* pp. 15-17 (clarifying Commerce's consideration of potential control in the context of majority versus minority ownership and the implications thereto with regard to rebutting the presumption); *id.* pp. 24-25 & n.26 (squaring this case with judicial precedent).

Briefly, Policy Bulletin 05.1 does not direct or otherwise require Commerce to address each *de facto* criterion and the *de jure* prong of its separate rate test before denying an exporter a separate rate.  Policy Bulletin 05.1 at 1-2 (summarizing Commerce's separate rate test); *see also Yantai CMC*, 203 F. Supp. 3d at 1326; *Rongxin III*, Slip Op. 18-107 at 19.  Plaintiffs' assertion that Commerce "treated government ownership as dispositive," Pls.' Mem. at 43, overlooks Commerce's consideration of the degree of government ownership (majority or minority), and fails to

disprove the evidentiary bases supporting Commerce's determination.  Plaintiffs'

reliance on *Jiasheng II*[30] to support the assertion that Commerce's decision contradicts

prior determinations is unavailing.  *See id*. (citing *Jiasheng II*, 121 F. Supp. 3d at 1269).

*Jiasheng II* concerned minority government ownership, *see* 121 F. Supp. 3d at 1269;

thus, government ownership was not dispositive of the degree of government control.

In sum, though Commerce now accords more weight to evidence of an exporter's

government ownership as a consequence of the *Diamond Sawblades* proceeding, it

does so within the confines of its longstanding separate rate test.  *See* I&D Mem. at 10-

12.  Commerce has, moreover, placed exporters on notice of this change.  *See, e.g.*,

Steel Wire Rod Mem. at 6-7.  Plaintiffs may disagree with the conclusions Commerce

reaches on the basis of this evidence, but mere disagreement is not a sufficient basis to

remand Commerce's determination.  Accordingly, Commerce's decision to deny

Plaintiffs' requests for separate rates is in accordance with law.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion is denied.  Judgment will enter

accordingly.


                                                                /s/      Mark A. Barnett
                                                                Mark A. Barnett, Judge

Dated:  October 11, 2018
             New York, New York

---

[30] Plaintiffs identify the case as "*Jiansheng I*"; however, the accompanying reporter
volume and pin cite suggests that Plaintiffs intended to cite to *Jiasheng II.*